## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **VERONICA BROWN, Individually and on Behalf of All Others Similarly Situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Jury Demanded** |
| **ABM INDUSTRIES, INC.; ABM JANITORIAL SERVICES, INC.; ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., DIVERSCO, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## COLLECTIVE AND CLASS ACTION COMPLAINT

Plaintiff, Veronica Brown, individually and on behalf of all others similarly situated, for her Collective and Class Action Complaint against the above-named Defendants (collectively, "Defendants"), state as follows:

### Nature of Plaintiff's Claims

1.      This is a collective and class action for unpaid wages brought by hourly paid janitors who used handwritten timesheets.

2.      Pursuant to Defendants' wage and hour policies and practices, Plaintiff and similarly situated janitors had their clock in and clock out times improperly and detrimentally rounded by Defendants, who had a practice of paying janitors according to their scheduled shift times and not for all time worked.

3.      At some point beginning in 2013, Defendants started to implement a new wage and hour policy and practice called "Pay By The Minute." Under this new policy and practice,

Defendants pay their hourly janitors for each minute worked rather than just their rounded, scheduled shift times.

4.     This case seeks redress for these janitors who were paid according to their scheduled shift times and not for all time worked.

5.     Count I seeks relief for overtime under the Fair Labor Standards Act for janitors who worked outside Illinois.  Count II seeks relief for overtime under the Illinois Minimum Wage Law for janitors who worked in Illinois.  Count III seeks relief for straight time under the Illinois Wage Payment and Collection Act for Illinois janitors who worked less than 40 hours in a workweek.

### Jurisdiction and Venue

6.     This Court has original federal question jurisdiction under 28 U.S.C. §1331 for the claims brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

7.     This Court also has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which

(a) there are 100 or more members of the proposed class;

(b) at least some of the members of the proposed class have a different citizenship than the defendants; and

(c) the claims of the proposed class members exceed $5,000,000 in the aggregate.

8.     This Court has personal jurisdiction over the Defendants for reasons that include:

(a) Defendants conduct business and enter into contracts within the State of Illinois and in this District and with businesses located within the State of Illinois and in this District;

(b) Defendants own, operate and maintain a fleet of service vehicles that support all operations, including janitorial services. Some of the vehicles in this fleet are registered

to Defendants' corporate addresses in the State of Illinois and support Defendants' business activities in the State of Illinois;

(c) As more specifically pled below, Defendants purposefully originated, implemented and controlled the wage and hour policies and practices that gave rise to the FLSA claims asserted herein, and Defendants purposefully directed their improper wage and hour policies and practices at residents of the State of Illinois and janitors who reside in this District, among other people;

(d) Defendants have purposefully directed the marketing of its janitorial services at residents and businesses located in the State of Illinois; and

(e) Defendants purposefully solicit Illinois businesses to enter into service agreements.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as Plaintiff resides in this District, Defendants have offices, conduct business, and can be found in this District, and the causes of action set forth herein have arisen and occurred, in part, in the Northern District of Illinois.

10.    Defendant ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. is a foreign corporation authorized to transact business in Illinois and has offices and business operations in Cook County, Illinois, as set forth *infra*.

11.    Defendant ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. is a resident of Cook County, Illinois

12.    ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES, INC. and/or ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., directly and/or jointly operate, control and manage offices in Cook County, Illinois where they process, calculate and issue payroll and paychecks for thousands of Illinois and Cook County resident janitors.

13. ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES, INC. and/or ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. directly and/or jointly operate, control and manage offices at 180 N. LaSalle Street, Chicago, Illinois 60601; 191 N. Wacker Drive, Chicago, Illinois 60606; 111 E. Wacker Drive, Chicago, Illinois 60601; 514-520 N. Noble, Chicago, Illinois 60622; 5035 W. 55th Street, Chicago, Illinois 60638; and at 5517 N. Cumberland Avenue, Chicago, Illinois 60656.

14. At all pertinent times, ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES, INC. and/or ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. directly and/or jointly employ thousands of hourly paid janitors in Cook County, Illinois, thousands of whom are Cook County, Illinois residents.

### Parties

#### i. *Plaintiff*

15. Plaintiff Veronica Brown is a resident of Illinois and worked for Defendants as an hourly paid, non-union employee from approximately 2008/2009 to May of 2013. A true and accurate copy of her current and prior consent forms are attached hereto as Group Exhibit A.

16. The overtime claims of Plaintiff Brown and of other FLSA collective action members is tolled for several months' time by operation of their filed consents in the matter of *Binissia v. ABM Industries, Inc.*, Case No. 13 cv 1230, N.D. Ill. and other Orders of the Court.

#### ii. *ABM Industries, Inc.*

17. ABM INDUSTRIES, INC. is incorporated in Delaware and its corporate headquarters are located at 551 Fifth Avenue, Suite 300, New York, NY 10176.

18. ABM INDUSTRIES, INC. and its subsidiaries employ approximately 118,000 individuals throughout the United States and various international locations.

4

19.     In its 2014 Annual Report to Shareholders, ABM INDUSTRIES, INC. states that "ABM has transformed from a company with annual revenues of $1.8 billion and approximately 60,000 employees into a leading provider of integrated facility solutions with revenues of more than $5.0 billion and approximately 118,000 employees throughout the United States and various international locations."

20.     At all times pertinent hereto, ABM INDUSTRIES, INC. engaged in the business of, amongst other things, providing janitorial cleaning services to purchasers of janitorial cleaning services across the United States and in the State of Illinois.

21.     At all times pertinent hereto, ABM INDUSTRIES, INC. engaged in the business of, amongst other things, providing janitorial cleaning services to purchasers of janitorial cleaning services in Cook County, Illinois.

22.     ABM INDUSTRIES, INC. has a corporate structure consisting of wholly-owned subsidiaries and operating units.

23.     ABM INDUSTRIES, INC. operates through its subsidiaries.

24.     At all times pertinent hereto, ABM INDUSTRIES, INC. was the parent corporation of ABM JANITORIAL SERVICES, INC.

25.     At all times pertinent hereto, ABM INDUSTRIES, INC., jointly with ABM JANITORIAL SERVICES, INC., ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC., directed, implemented and controlled the rounding policies and practices at issue in this lawsuit.  Further, ABM INDUSTRIES, INC. both ratified and implemented the rounding policies and practices on Plaintiff and the putative class members.

26.     At all times pertinent hereto, ABM INDUSTRIES, INC. was the "employer" of Plaintiff and members of the putative class, as the term "Employer" is defined under the FLSA, IMWL and IWPCA. Alternatively, ABM INDUSTRIES, INC. jointly employed the putative class members with its wholly-owned and controlled subsidiaries, including ABM JANITORIAL SERVICES, INC., ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC. As such, ABM INDUSTRIES, INC. is jointly and severally liable for the FLSA, IMWL and IWPCA violations described herein.

### *iii.     ABM Janitorial Services, Inc.*

27.     ABM JANITORIAL SERVICES, INC. is a foreign corporation.

28.     At all times pertinent hereto, ABM JANITORIAL SERVICES, INC. engaged in the business of providing janitorial cleaning services to purchasers of janitorial cleaning services in the United States and the State of Illinois.

29.     At all times pertinent hereto, ABM JANITORIAL SERVICES, INC. engaged in the business of providing janitorial cleaning services to purchasers of janitorial cleaning services in Cook County, Illinois.

30.     At all times pertinent hereto, ABM JANITORIAL SERVICES, INC. is and was a wholly-owned subsidiary of ABM INDUSTRIES, INC.

31.     At all times pertinent hereto, ABM JANITORIAL SERVICES, INC. was the parent corporation of ABM JANITORIAL SERVICES – NORTH CENTRAL, INC.

32.     At all times pertinent hereto, ABM JANITORIAL SERVICES, INC., jointly with ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC., directed,

implemented and controlled the rounding policies and practices at issue in this lawsuit. Further, ABM JANITORIAL SERVICES, INC. both ratified and implemented the rounding policies and practices on Plaintiff and the putative class members.

33.     At all times pertinent hereto, ABM JANITORIAL SERVICES, INC. was the "employer" of the Plaintiff and members of the putative class, as the term "Employer" is defined under the FLSA, IMWL and IWPCA. Alternatively, ABM JANITORIAL SERVICES, INC. jointly employed the putative class members with its wholly-owned and controlled subsidiaries as well as its parent corporation and affiliates, including ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC. As such, ABM JANITORIAL SERVICES, INC. is jointly and severally liable for the FLSA, IMWL and IWPCA violations described herein.

### iv.     *ABM Janitorial Services – North Central, Inc.*

34.     Defendant ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. is a California corporation that provides janitorial services to businesses and entities.

35.     At all times pertinent hereto, ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. engaged in the business of providing janitorial cleaning services to purchasers of janitorial cleaning services in the United States and the State of Illinois.

36.     At all times pertinent hereto, ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. engaged in the business of providing janitorial cleaning services to purchasers of janitorial cleaning services in Cook County, Illinois.

37.     ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. is a wholly-owned and controlled subsidiary of ABM JANITORIAL SERVICES, INC.

38.     At all times pertinent hereto, ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., jointly with ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC., directed, implemented and controlled the rounding policies and practices at issue in this lawsuit.  Further, ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. both ratified and implemented the rounding policies and practices on Plaintiff and the putative class members.

39.     At all times pertinent hereto, ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. was the "employer" of Plaintiff and certain members of the putative class, as the term "Employer" is defined under the FLSA, IMWL and IWPCA.  Alternatively, ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. jointly employed the putative class members with its wholly-owned and controlled subsidiaries as well as its parent corporation and affiliates including ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC.  As such, ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. is jointly and severally liable for the FLSA, IMWL and IWPCA violations described herein.

40.     ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. is a resident of Cook County, Illinois under 735 ILCS 5/2-102(a) because, among other things, it is authorized to transact business in the State of Illinois, it has offices in Cook County, Illinois, it is doing business in Cook County, Illinois, and it employs thousands of residents of Cook County, Illinois.

   *v.*     ***ABM Janitorial Services – Southeast, LLC***

41.     ABM Janitorial Services – Southeast, LLC is a California limited liability company that provided janitorial services to businesses and entities during the recovery periods under the FLSA.

42.     ABM JANITORIAL SERVICES – SOUTHEAST, LLC is a manager-managed limited liability company.

43.     ABM JANITORIAL SERVICES – SOUTHEAST, LLC is managed by ABM JANITORIAL SERVICES, INC.

44.     ABM JANITORIAL SERVICES – SOUTHEAST, LLC is registered with the Illinois Secretary of State and is qualified to do business in Illinois.

45.     ABM JANITORIAL SERVICES – SOUTHEAST, LLC is a wholly-owned and controlled subsidiary of ABM JANITORIAL SERVICES, INC.

46.     ABM JANITORIAL SERVICES – SOUTHEAST, LLC, directly and/or jointly with ABM INDUSTRIES, INC. and/or ABM JANITORIAL SERVICES, INC., directed, implemented and controlled the rounding policies and practices at issue in this lawsuit. Further, they both ratified and implemented the rounding policies and practices on certain of the putative class members.

47.     During the prior three years, ABM JANITORIAL SERVICES – SOUTHEAST, LLC was the "employer" of certain members of the putative class, as the term "Employer" is defined under the FLSA.

### *vi.*     *Diversco, Inc.*

48.     DIVERSCO, INC. is a foreign corporation organized under the laws of South Carolina and it is authorized to transact business in the State of Illinois.

49.     ABM INDUSTRIES, INC. and/or ABM JANITORIAL SERVICES, INC. acquired DIVERSCO, INC. on or about June 30, 2010.

50. DIVERSCO, INC. is a janitorial services company that provides, *inter alia*, janitors and cleaners to manufacturing, industrial and commercial buildings across the country, including in the State of Illinois.

51. DIVERSCO, INC. is wholly owned by ABM INDUSTRIES, INC.

52. ABM INDUSTRIES, INC. owns all outstanding shares of DIVERSCO, INC.

53. James M. McClure is the President of DIVERSCO, INC. and Sarah H. McConnell is its Secretary. Mr. McClure and Ms. McConnell hold the same job positions for ABM INDUSTRIES, INC.

54. At all relevant times, DIVERSCO, INC., jointly with ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., directed, implemented and controlled the rounding policies and practices at issue in this lawsuit. Further, DIVERSCO, INC. both ratified and implemented the rounding policies and practices on the putative class members.

55. At all relevant times, DIVERSCO, INC. was the "employer" of certain members of the putative class, as the term "Employer" is defined under the FLSA, IMWL and IWPCA. Alternatively, DIVERSCO, INC. jointly employed the putative class members with its parent and affiliates, including ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES, INC., ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC. As such, DIVERSCO, INC. is jointly and severally liable for the FLSA, IMWL and IWPCA violations described herein.

## Factual Background

### i. Defendants' Use of Handwritten Timesheets for Janitors

56.     During the statutory period, DEFENDANTS have used three types of timekeeping devices: handwritten timesheets, old-fashioned punch cards and electronic timekeeping devices (e.g., biometric/fingerprint, telephone, key card).

57.     This case involves janitors who used handwritten timesheets and did not use punch cards or electronic timekeeping methods.  These janitors did not use punch cards, keycards, fingerprint scanners and key-number pads at any time from the beginning of the statutory recovery period to the date Defendant actually implemented its "Pay By The Minute" policy and practice. These are the putative class members.

58.     DEFENDANTS required these janitors to write down and record only their scheduled hours down on their handwritten timesheets, rather than recording all time worked each work day and workweek.

59.     DEFENDANTS know, and are able to identify, which janitors used only timesheets as a time keeping method during the period starting three years before the filing of this Complaint.

### ii. Defendants' Practice of Rounding and Paying According to Scheduled Shift Times Rather Than All Work Time

60.     Plaintiff Brown worked as a janitor for Defendants from approximately 2009 until approximately March of 2013.

61.     While working as a janitor, Plaintiff Brown used timesheets as a timekeeping method.

62.     During the class period, and per Defendants' policy and practice, Defendants instructed Plaintiff Brown to put down her scheduled shift times, and not her actual work times, on handwritten timesheets.

63. For example, when Plaintiff Brown worked a shift of 6 a.m. to 3 p.m., she would regularly spend approximately 15 minutes prior to her scheduled shift time preparing her janitorial supplies and equipment which included a cart, wet mops, buckets, soaps, glass cleaners and toilet cleaning supplies

64. Defendants did not permit Plaintiff Brown or other similarly situated janitors from recording this pre-shift work on their timesheets or payroll records.

65. Plaintiff Veronica Brown and similarly situated janitors performed compensable work activities during their thirty minute meal break.

66. Plaintiff Brown and similarly situated janitors performed compensable work activities during the time that was rounded away under Defendants' policies and practices described herein.

67. During the class period, handwritten timesheets were a common timekeeping method used by janitors employed by Defendants.

68. During the class period, and per Defendants' policy and practice, Defendants instructed their supervisors and janitors to put down on the handwritten timesheets the janitors' scheduled shift times, and not their actual work times.

69. The handwritten timesheets and the janitors' schedules, rather than all time worked, were used to calculate the janitors' wages, paychecks and compensation, even though the scheduled shift times did not reflect or capture all hours worked by the Plaintiff and similarly situated janitors, including the time the janitors spent collecting and preparing their supplies before the start of their scheduled shift times and/or working past the end of their scheduled shift times.

70. The janitors' handwritten timesheets were effectively rounded from the janitors' actual work times to a rounded time that matched up to their schedules, to the janitors' detriment.

12

### iii. 16 Illinois and New York Janitors Testified At Their Federal Depositions That Defendants Required Them To Perform the Same Pre-Shift Work Without Compensation

71.    Between February 1, 2012 and the present, 16 individuals who worked as janitors for DEFENDANTS in Illinois and New York testified at their depositions that DEFENDANTS required them to arrive early, before the start of their scheduled shift time, and begin working and preparing their supplies, carts, wet mops, toilet cleaners, spray bottles, paper towels, etc., but they were not paid for this pre-shift work.

72.    These 16 individuals were subjected to DEFENDANTS' rounding practices and were generally paid for their scheduled shift times, rather than all time worked, including the same type of pre-shift work at issue in this class action.

### iv. Over 1,150 Current and Former Janitors Have Provided Affidavits Stating That Defendants Required and/or Permitted Them to Perform the Pre-shift Work Without Compensation

73.    individualized Declarations from 1,150+ current and former janitors who worked in over 50 different cities in Illinois, New York, New Jersey, Connecticut, Washington, D.C., Iowa, Indiana, Kansas, Kentucky, Maryland, Missouri, Missouri, Ohio, Pennsylvania, Virginia and Wisconsin.

74.    These 1,150+ people state that they regularly worked before and after their scheduled shift times (and during meal breaks) but had that work time shaved and rounded away to their detriment by ABM.

75.    Over 220 current and former janitors from over a dozen different states who used handwritten timesheets while working for DEFENDANTS have submitted Declarations stating that they worked before and after their scheduled shift times but were only paid their rounded, scheduled shift time.

76. Additionally, ABM Supervisors have testified regarding the seminars and training ABM gives its Supervisors, Operations Managers and Branch Managers on not just how to round, but how to round away the janitors' work and punch times.

77. For example, Marlin Hunt, a project manager at ABM in Chicago, stated that his field manager trained him to instruct janitors to arrive early, before the start time of their scheduled shift, so that they could punch in, collect their supplies, and get to their designated areas to begin cleaning. He trained foremen to give janitors these same instructions. He was also trained to review punch cards and to prepare spreadsheets summarizing the number of hours that his janitors worked.

78. Unless a janitor had obtained prior approval for overtime work, Mr. Hunt would "enter the scheduled shift times (8 hours) into the summary spreadsheets, rather than the actual punch times on the punch cards, as the hours worked by each janitor during the pay period on the timesheet summary."

79. Mr. Hunt regularly handwrote the number "8" next to a janitor's shift on the punch card, even if the janitor actually worked more than eight hours.

80. Mr. Hunt attended training seminars with other ABM supervisors in conference rooms at the Lyric Opera House in Chicago, where the head of the payroll department for ABM's Midwest Region instructed supervisors to round shift punches of individual janitors by handwriting "8" next to each shift punch and to enter forty hours on the summary spreadsheets for each week unless there was approved overtime.

81. Antoni Chmenia, a janitorial foreman for ABM at two locations in Chicago, was also trained by ABM INDUSTRIES, INC., ABM JANITORIAL SERVICES – NORTH CENTRAL, INC. and ABM JANITORIAL SERVICEs, INC. to enter a janitor's scheduled shift times into the summary spreadsheets, rather than the actual punch times on the punch cards.

14

82. Mr. Chmenia's field manager trained him to handwrite the number "8" next to a janitor's shift on the punch card, even if the janitor actually worked more than eight hours.

83. Mr. Chmenia's supervisor provided him with written materials from ABM training seminars that instructed him to write an "8" on punch cards and enter forty hours for every week a janitor worked in the summary spreadsheets.

84. Soraida Marroquin worked as a "Working Supervisor" in Levvitown, Pennsylvania near Philadelphia and New York City.

85. Ms. Marroquin's Supervisor, Joe Zundo, instructed her to require all the janitors she supervised to arrive at work at least 15 minutes before the start of her scheduled shift time so that they could collect and prepare their supplies and begin working before the start of their scheduled shift time.

86. Ms. Marroquin supervised janitors who used punch cards and electronic timekeeping methods (both biometric/fingerprint and telephone). For punch cards, her Supervisor, Mr. Zundo, and her District Supervisor/Manager, Artie, trained her to handwrite the number "8" next to all the punch times on punch cards, even though the janitors punched in and began working before the start of their scheduled shift time.

87. When DEFENDANTS changed from punch cards to fingerprint scanner timekeeping, Margie Lopez, an administrative coordinator at ABM's Kennywood, PA office, sent an email to all Supervisors in New Jersey and to Ms. Marroquin informing them of a mandatory training seminar regarding ABM's payroll practices.

88. At the training seminar, approximately 25 other Supervisors were present and all of the other "big bosses" from Margie Lopez to Frankie Deblasio and Artie instructed Ms. Marroquin and other 25 Supervisors, via a projector screen, on how to "fix" the electronic punches

15

from the fingerprint scanner so that when janitors punched in for more than 8 hours in any given day, the Supervisors could and would access the particular punch on their computers and change the entry for that day to 8 hours so that the scheduled hours would be reflected for payroll, even though the janitor worked more than 8 hours that day.

89.     Ms. Marroquin attended other similar seminars where ABM trained her and other Supervisors to similarly "fix" the punches for those janitors who punched in via phone.

90.     Additionally, Joe Zundo instructed her that ABM policy required her to deducted 15 minutes for any janitor who arrived late.  Ms. Marroquin constantly complained to her Supervisors that she and other janitors were not being paid for all their work, and the Supervisors responded by saying that ABM does not have enough money to pay overtime.

91.     Several dozen other former high level ABM employees all state that ABM trained and implemented detrimental rounding practices and paid janitors according to their scheduled shift time, and not for all time worked, just like Ms. Hunt, Mr. Chmieni and Ms. Marroquin testified to as well.

> ### v.     The U.S. Department of Labor's Investigation and Findings Regarding Defendants' Rounding Practices & Defendants' Agreement With and Promise To the Federal Government to Cease Defendants' Improper Rounding Policy and Practice

92.     Evidence of Defendants' practice of rounding janitors' work times is wide-spread across the country and has occurred in at least two of Defendants' regions for a significant period of time.

93.     For example, in 2011 the United States Department of Labor investigated Defendants' rounding practices for janitors at the Philadelphia International Airport in Philadelphia, Pennsylvania.

94.     ABM INDUSTRIES, INC.'S in-house attorneys in Texas handled the U.S. Department of Labor's investigation, including attending meetings and conferences with representatives from the U.S. DOL.

95.     Because of improper rounding on punch cards where supervisors were instructed to write "8" over the punch times and stamps on the punch cards per ABM INDUSTRIES, INC.'s policy and practice, the U.S. Department of Labor investigation resulted in 21 janitors at the Philadelphia International Airport receiving an average back wage payment of approximately $912 each.

96.     Ivette Vigano, the Assistant District Director for the U.S. Department of Labor at the time, corresponded with attorneys in the corporate legal department of ABM INDUSTRIES, INC. regarding the U.S. Department of Labor's findings.

97.     Ivette Vigano also discussed with ABM INDUSTRIES, INC.'S in-house counsel ABM INDUSTRIES, INC.'s agreement to i) comply with the wage and hour and recordkeeping provisions of the Fair Labor Standards Act and ii) ensure that unfair rounding of janitors' punch times would not happen again at ABM INDUSTRIES, INC. or its janitorial subsidiaries.

98.     ABM INDUSTRIES, INC.'S in-house attorneys in Texas were aware of the U.S. DOL Investigation of the rounding practices at the Philadelphia International Airport and the investigation's outcome.

99.     The two-page U.S Department of Labor Compliance Action Report states in pertinent part about the Philadelphia rounding:

> "Section violations – not all hours worked were counted due to inconsistent rounding practice, resulting incorrect tabulation of time cards.  21 employees due $19167.11.  ER ATC and ATP BW by 8/13/2011.  Large firm with multiple prior investigations.  First investigation for this branch. Houston MODO directed CMPs [civil monetary penalties] be assessed."

100.     On behalf of ABM INDUSTRIES, INC. and its subsidiaries and the Defendants, Lenore Espinosa, as assistant general counsel for ABM INDUSTRIES, INC. and its subsidiaries and the Defendants, made the following agreement with and promise to the federal government:

> "Ms. Sacus and Ms. Espinosa were informed that in order to comply with the FLSA, the firm must:
>
> Be consistent in its rounding practices so as to fully and accurately compensate employees for all hours worked;
> …
> During the final conference, Ms. Sacus and Ms. Espinosa verbally agreed to future compliance with the Act and all applicable regulations.  They listed several steps that would be taken immediately to achieve and maintain compliance:
>
> > • Remind managers of their responsibility to ensure that time records accurately reflect employees' hours worked.  This would be done by ensuring that time cards are tabulated using a fair and consistent rounding rule…"

101.     This final conference between the U.S. Department of Labor and ABM occurred on July 13, 2011.

102.     Just like the locations where the janitors' work times were rounded on handwritten timesheets, the janitors' punch cards at the Philadelphia International Airport were rounded to their detriment.

103.     Training, requiring and permitting supervisors and managers to put the scheduled shift hours on punch cards, rather than using the actual hours worked to calculate payroll, is a manifestation of the overall practice of DEFENDANTS to round janitors' actual work times and pay for scheduled shift times and not all time worked.  A second manifestation of DEFENDANTS' rounding practices is requiring and/or permitting janitors to put and record scheduled shift hours on timesheets, rather than all hours worked, including the pre-shift work described herein.

> ### vi.     *Additional Evidence of Defendants' Practice of Rounding and Paying According to Scheduled Shift Times Rather Than All Work Time*

104.    In *Las v. ABM Industries, Inc.*, Illinois janitors brought wage and hour claims under the Fair Labor Standards Act for unpaid pre-shift work identical to that at issue in the instant case. In *Las v. ABM Industries, Inc.*, the janitors' punch cards contained the identical rounding as found on the punch cards reviewed by the U.S. DOL investigation at the Philadelphia International Airport where an "8" was written over the punch time stamps on punch cards.  *Las v. ABM Industries, Inc.*, 11 cv 5644 (N.D. Ill. 2011)(Dkt. No. 34, Ex. 8; Dkt. 54, Exs. 10, 11).

105.    In *Binissia v. ABM Industries, Inc.*, approximately 1,100 current and former janitors employed by Defendants provided affidavits stating that they too experienced rounding and being paid according to their scheduled shift time and not for all time worked.  Approximately 1,100 janitors from over twelve different states provided factual descriptions of rounding, being paid according to the scheduled shift and not by the minute, and of having to collect and prepare their supplies, carts, wet mops, toilet cleaners, spray bottles, etc. and begin working before their scheduled shift times.  *Binissa v. ABM Industries, Inc.*, No. 13 cv 1230 (United States District Court, Northern District of Illinois)(Doc. Nos. 140, 141, 313, 314, 316, 317).

106.    In *Khadera v. ABM Industries, Inc.*, No. C08-0417 RSM, U.S.D.C., W. D. Wash.), the court denied ABM Industries, Inc.'s motion to decertify a class of janitors who alleged they worked outside their scheduled shift times but were not paid for it.

107.    In addition to handwritten timesheets, the electronic timekeeping systems used by DEFENDANTS during the last three years and prior to the "Pay By The Minute Policy" were designed and configured by DEFENDANTS to round the janitors' actual punch times.

###### *vii.*     *Centralized Control: the Parent Corporation Controls All Regions' Wage and Hour Policies, Practices, Lawsuits and U.S. DOL Investigations*

108.    The setting of wage and hour and time keeping policies and practices for DEFENDANTS' janitors is directly established by ABM INDUSTRIES, INC. and ABM JANITORIAL SERVICES, INC. and implemented through ABM JANITORIAL SERVICES – NORTHEAST, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and DIVERSCO, INC., among others.

109.    Defendants' wage and hour policies, including those regarding overtime pay, are established by ABM INDUSTRIES, INC. and jointly implemented by ABM JANITORIAL SERVICES, INC. and their regional subsidiaries, including ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and DIVERSCO, INC.

110.    Beginning on September 29, 2012, Defendants changed their nationwide payroll policy by paying janitors to the minute rather than to the scheduled shift time (or in rounded increments).  ABM INDUSTRIES, INC. is "in charge" of the policy change and its roll out.

111.    ABM INDUSTRIES, INC. provides company-wide wage and hour instructions and training to the regional subsidiaries, including a power point presentation stating that "Rounding to nearest 15 minutes is permitted by law and ABM policy."

112.    In its 2014 Form 10-K, ABM INDUSTRIES, INC. states:

> Our Janitorial segment provides a wide range of essential janitorial services for a variety of facilities, including commercial office buildings, educational institutions, government buildings, health facilities, industrial buildings, retail stores, shopping centers, stadiums and arenas, airports and other transportation centers, and warehouses. These services include carpet cleaning and dusting, floor cleaning and finishing, furniture polishing, window washing, and other building cleaning services. Janitorial services are provided in all 50 states, the District of Columbia, and the Commonwealth of Puerto Rico, as well as in certain international locations. This segment has thousands of contracts, most of which are obtained by competitive bidding.

These arrangements include fixed-price arrangements, cost-plus arrangements, and tag (supplemental) services. Fixed-price arrangements are contracts in which the client agrees to pay a fixed fee every month over a specified contract term. A variation of a fixed-price arrangement is a square-foot arrangement, under which monthly billings are based on the actual square footage serviced. In costplus arrangements, the clients reimburse us for the agreed-upon amount of wages and benefits, payroll taxes, insurance charges, and other expenses associated with the contracted work, plus a profit margin. Tag work generally consists of supplemental services requested by clients outside the standard service specification. Examples are cleanup after tenant moves, construction cleanup, flood cleanup, snow removal, and extermination services. The majority of the Janitorial segment's contracts are fixed-price arrangements for one to three year periods that contain automatic renewal clauses but are subject to termination by either party upon 30 to 90 days ' written notice. Profit margins on contracts tend to be inversely proportional to the size of the contract, as large-scale contracts tend to be more competitively priced than small or stand-alone agreements.

113.    Plaintiff and the putative class members are the workers who do the above-described janitorial work, and from which all of the profits obtained by ABM INDUSTRIES, INC. for that work are derived.

114.    At all relevant times, ABM INDUSTRIES, INC. has held itself out to the general public through the following statement: "All directors, officers and employees of ABM and its subsidiaries and affiliates adhere to a Code of Business Conduct.  We give new employees a copy of the code, we post it in company break rooms, and each year we require certain management employees to review the Code and attest to compliance with it. Our Code of Business Conduct is approved by our Board of Directors. While our Code requires us to comply with applicable laws and regulations where we do business, it is not only about compliance.  Rather, it provides us with an ethical framework for achieving our goals by focusing on areas of ethical risk and providing tools to our people recognize and deal with ethical risks; report unethical conduct; and preserve and nurture our culture of honesty, integrity and accountability."

115.    At all relevant times, ABM INDUSTRIES INC. adopted and approved a corporate "Code of Business Conduct," which states as follows:

**Code of Business Conduct**

Our Code of Business Conduct was approved by our Board of Directors. **It applies to all directors, officers and employees of ABM and its subsidiaries and affiliates, wherever located.** In this Code, when we refer to "the Company", we are referring generally to ABM, it subsidiaries and affiliates. Our Board, together with our Chief Executive Officer and Chief Financial Officer and all of the Company's other leaders and employees, stand behind the Code. While our Code of Business Conduct requires us to comply with applicable laws and regulations where we do business, it is not only about compliance. Rather, it provides us with an ethical framework for achieving our goals by focusing on areas of ethical risk and providing tools to help our directors, officers and employees to recognize and deal with ethical risks, to report unethical conduct and to preserve and nurture our culture of honesty, integrity and accountability.

*Compliance with Laws, Regulations and Policies*

Compliance with laws, rules and regulations is core to our business. We conduct our activities in compliance with all laws, rules and regulations of the jurisdictions in which we do business. We comply with both the letter and the spirit of the law. Fraud, theft, dishonesty, embezzlement, misappropriation or falsification in connection with your duties for the Company are never tolerated and all such acts may result in immediate termination of employment for cause.

You are expected to obey and comply with all federal, state and local laws, regulations and ordinances, including but not limited to:

·  Immigration related laws concerning the hiring of legally documented workers;

·  **Employment laws concerning payment of minimum wage, overtime requirements, child labor and general working conditions**;

·  Labor laws concerning worker organizing and bargaining activities;

·  Health and safety laws concerning the workplace;

·  Civil rights laws concerning harassment and job discrimination;

·  Federal laws concerning racketeering and corrupt practices;

· Laws concerning unlawful influence of foreign officials and falsification of records;

· Laws concerning the proper maintenance of books, records and internal controls;

· Laws, regulations, and contract provisions in connection with the Company's government contracting activities; and

· Any other applicable federal, state or local law, regulation or ordinance.

**In addition, you are expected to be familiar with and comply with the Company's various policies and procedures. Violation of Company policies and work rules may result in disciplinary action, up to and including termination.**

We understand that you may be uncertain as to whether a transaction or course of conduct complies with applicable laws, rule and regulations. **When you are uncertain, it is expected that you will obtain advice from the Company's General Counsel and to act in accordance with that advice.**

*Fair Dealing*

Fairness is one of our core values and each employee is expected to deal fairly with the Company's customers, suppliers, competitors and other employees. You should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, falsification, misrepresentation of material facts or any other unfair dealing practice. Unauthorized use of covert surveillance equipment, including video, photographic or recording devices, is strictly prohibited.

*Accounting and Recordkeeping*

As a public company, we periodically release certain information about our finances to the public. Accurate and honest recording and disclosure of information is important to appropriate public financial disclosure and also important to making responsible business decisions. The Company requires that all records involving its businesses be complete and accurate and that all required disclosures be timely, accurate and understandable. Many people associated with the Company, not just accountants and controllers, participate in the financial control and reporting processes of the Company. If you have any responsibility for any aspect of the Company's record keeping (including, but not limited to processing of cash receipts or processing or approval of payments; creation, processing or approval of invoices and credit memos; payroll and benefits decisions; submission or approval of expense

reports and any and all other transactions; or the estimation of reserves or other claims or the amount of any accrual or deferral; or the recording of any of the foregoing in the Company's ledgers) and/or the preparation of the Company's financial statements or other reports, you must see to it that complete and accurate books and records are maintained.

**Internal controls are an essential part of accounting and the effective operation of a business enterprise. They are designed to ensure the integrity of the accounting data in the Company's financial statements and reports. They also prevent inefficiency, waste and the improper use of the Company's funds or other assets. ABM has adopted certain more detailed policies and procedures on internal controls. These are made available to all employees who are involved with internal controls.**

A strong audit effort helps ensure compliance with established policies, procedures and controls and helps identify potential control deficiencies so that they may be promptly corrected. The Company's internal audit function is an essential resource, and it plays a critical role in providing management with evaluations of the effectiveness of internal controls over accounting, operational and administrative functions. If you receive inquiries from the Company's internal or independent auditors, accountants, or the Audit Committee you must respond promptly, fully and accurately.

The Company does not tolerate any subversion of the Company's systems of internal accounting controls, funds or assets for any illegal or improper purposes nor does it tolerate the making of false or misleading statements in any Company documents, reports or records. No undisclosed or unrecorded accounts may be established using the Company's funds or other assets. **Any employee who is directed to act in a manner that he or she believes is not in compliance with this Code should seek guidance and report the matter to the HelpLine, the General Counsel or the Internal Audit department.**

*Employee Health and Safety*

The Company is committed to a safe and healthy work environment for its employees at all times. You are expected to comply with established safety, health and environmental regulations and ABM's safety and environmental policies. To that end, you are prohibited from using or possessing alcohol or drugs in violation of any federal, state or local law, regulation or ordinance or Company policy at your workplace or in connection with your work, in a Company vehicle or in any motor vehicle when used in connection with Company business. You are also prohibited from threatening or using any threatening behavior or taking any violent actions at any time in the workplace or in connection with Company business. Finally, you are prohibited from possessing any firearm, ammunition, incendiary device or other weapon, at your workplace, in a Company vehicle or at any time in

connection with Company business except for Company employees who are security officers and specifically authorized to carry a weapon as part of a work assignment.

*Reporting Illegal or Unethical Behavior*

We encourage employees to talk to their supervisor, manager or human resource representative when in doubt about the best course of action to take in a particular situation. Any director or employee who believes another director, employee or any agent, consultant or contract worker is violating the Company's policies, the law, or any contract provisions in connection with the Company's government contracting activities or is engaging in any activity that could damage ABM's reputation is required to immediately call this to the attention of management, the Company's General Counsel or one or more of the following:

• Any person designated in this Code or the Commitments Policy as responsible for compliance in the specified area involved
• The Vice President of Internal Audit
• The Senior Vice President of Human Resources
• ABM's Compliance Hotline

The Compliance Hotline is a toll-free, confidential, third party service set up for employees to report possible violations of the law, this Code or other ABM policies. The Hotline is staffed 24 hours per day and calls can be accepted in any language. Callers may make reports anonymously if they choose. The Compliance Hotline can be reached at 1-877-253-7804. Reports are also accepted online at abmhotline.ethicspoint.com. All calls and online reports will be promptly forwarded to ABM's Corporate Headquarters for investigation and review. Employees may also report issues or problems by mail addressed to ABM Compliance, ABM Industries Incorporated, 551 Fifth Avenue, Suite 300, New York, NY 10176.

A failure to report a violation is itself a violation of this Code.

We do not tolerate retaliation against anyone who, in good faith, reports a possible violation of any law or Company policy. Any employee or manager who attempts to retaliate against an individual who has reported a violation or possible violation of this Code will face serious disciplinary action, up to and including termination.

*Penalties for Violations*

Violations of this Code or failure to cooperate with an internal investigation relating to an actual or apparent violation of this Code constitutes grounds for corrective action, including immediate termination of employment. In

addition, some Code violations may be serious enough to result in civil or criminal fines and/or imprisonment.

116.     The "Code of Business Conduct" places ABM INDUSTRIES, INC. in complete control of the Labor and Employment practices of its divisions and operating units, including but not limited to ABM JANITORIAL SERVICES, INC. and its various janitorial services subsidiaries and affiliates.

117.     Pursuant to the "Code of Business Conduct," all janitorial affiliates or subsidiaries of ABM INDUSTRIES, INC. are required to either i) seek guidance from ABM INDUSTRIES INC.'S officers, compliance department and/or general counsel to resolve material or significant wage and hour violations that may arise within its janitorial workforce, or ii) follow the policies and practices announced and established by ABM INDUSTRIES, INC.

118.     As part of ABM INDUSTRIES, INC.'S 2012, 2013 and 2014 Form 10-K, ABM INDUSTRIES INCORPORATED'S CEO signed an SEC certification statement that certifies, among other things, that ABM INDUSTRIES, INC. has implemented and monitored certain controls over its Subsidiaries. This certification attests that ABM INDUSTRIES INC.'S CEO has established and maintained disclosure controls within ABM INDUSTRIES INC.'S Subsidiaries so that material information regarding these Subsidiaries' financial information and the reliability of the financial information is reported directly to ABM INDUSTRIES, INC.

119.     ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC, and DIVERSCO, INC. were controlled by and acted in all respects pertinent to this action as the agents of ABM INDUSTRIES, INC. and as agents of ABM JANITORIAL SERVICES, INC.

120. ABM INDUSTRIES, INC. and its subsidiaries carried out a joint scheme, business plan, or policy in all respects pertinent hereto, and the acts of each DEFENDANT are legally attributable to the other DEFENDANTS.

121. ABM INDUSTRIES, INC.'s in-house counsel's office typically handles the investigations by the U.S. Department of Labor and state departments of labor regarding DEFENDANTS' wage and hour policies and practices.

122. ABM INDUSTRIES, INC.'s in-house counsel advises and instructs DEFENDANTS' regional locations and offices and subsidiaries to implement or change their wage and hour policies and practices, including corrections and responses to U.S. Department of Labor and state departments of labor investigations.

123. ABM INDUSTRIES, INC.'s in-house counsel works in conjunction with top corporate officers at ABM INDUSTRIES, INC. and the DEFENDANTS at the subsidiary level to mandate and implement labor policies and practices nationwide, including those at issue in this collective action.

124. The corporate parent, ABM INDUSTRIES, INC., has only one corporate legal department, which serves ABM INDUSTRIES, INC. and all its regions, subsidiaries and affiliates, including those in Illinois.

125. During the last three years, ABM INDUSTRIES, INC. has and/or had a corporate legal department that contains a "Labor & Employment Group."

126. The ABM INDUSTRIES, INC. corporate legal department coordinates, with local counsel, the defense of all wage and hour class actions filed against ABM INDUSTRIES, INC., including all of its regions, subsidiaries and affiliates nationwide, including those in Illinois.

127.    Members of the ABM INDUSTRIES, INC. corporate legal department are responsible for ensuring and coordinating the implementation of all remedial payroll policies, practices and procedures mandated by the U.S. Department of Labor and all State departments of Labor nationwide.

128.    The corporate legal department for ABM INDUSTRIES, INC. was directly involved in handling the U.S. Department of Labor investigation of the improper rounding practices that DEFENDANTS applied to janitors who worked at the Philadelphia International Airport.

129.    At the conclusion of the U.S. Department of Labor investigation into the pay and rounding practices at the Philadelphia International Airport described *supra*, the corporate legal department for ABM INDUSTRIES, INC. agreed that it would ensure that all hourly paid janitors employed by Defendants were not subject to an illegal and unfair rounding practice of janitors' punch-in and punch-out times.

130.    Assistant General Counsel Lenore Espinosa and another Assistant General Counsel Jackie Sacus, on behalf of ABM, made the representation and promise to the federal government in 2011 that ABM would sufficiently investigate and fix any improper rounding.

131.    On behalf of ABM Industries, Inc. and its subsidiaries and the Defendants, assistant general counsel Lenore Espinosa made the following agreement with and promise to the federal government:

> "Ms. Sacus and Ms. Espinosa were informed that in order to comply with the FLSA, the firm must:
>
> Be consistent in its rounding practices so as to fully and accurately compensate employees for all hours worked;
> …
> During the final conference, Ms. Sacus and Ms. Esinosa verbally agreed to future compliance with the Act and all applicable regulations.  They listed

several steps that would be taken immediately to achieve and maintain compliance:

> • Remind managers of their responsibility to ensure that time records accurately reflect employees' hours worked. This would be done by ensuring that time cards are tabulated using a fair and consistent rounding rule…"

132.    This final conference between the U.S. Department of Labor and ABM occurred on July 13, 2011.

133.    At all relevant times, the General Counsel for ABM INDUSTRIES, INC. and its General Counsel knew that the subsidiaries of ABM INDUSTRIES, INC. rounded the timesheets, punch cards and electronic timekeeping methods, as described *supra*.

134.    At all relevant times, the corporate legal department for ABM INDUSTRIES, INC. knew that the subsidiaries of ABM INDUSTRIES, INC. rounded the timesheets, punch cards and electronic timekeeping methods, as described *supra*.

135.    One of the functions of the ABM INDUSTRIES, INC. corporate legal department is to manage the risk exposure created by the implementation of payroll policies, practices and procedures for all regions, subsidiaries and affiliates, including the payroll policies, practices and procedures relating to the rounding of hours worked by the hourly janitor employees.

136.    Former Chief Executive Officer Henrik Slipsager and President James McClure regularly handled ABM INDUSTRIES, INC.'s quarterly earnings calls with shareholders in 2012, 2013 and 2014. During the earnings call for the third quarter of 2013, they both reported to shareholders how ABM INDUSTRIES, INC.'s "operating profit margins" for the third quarter of 2014 increased significantly "primarily" because, according to Mr. Slipsager and Mr. McClure, ABM controlled and lowered the labor costs of its janitors, which includes the amount of wages and overtime paid to the putative class of janitors.

137. A district manager for a janitorial subsidiary of ABM INDUSTRIES, INC.'S in the State of Washington wrote in June 2009: "We have been asked by Upper Management of ABM to cut labor in every area possible across the nation immediately."

138. At all times relevant hereto, ABM INDUSTRIES, INC. directly and/or jointly with ABM JANITORIAL SERVICES, INC., ABM JANITORIAL SERVICES – NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and DIVERSCO, INC. originated, controlled and implemented the payroll policy, practice and procedure of rounding hours worked by hourly paid janitors by training supervisors to submit Excel spreadsheets to the payroll department with payroll data for the hourly janitor employees they manage reflecting their respective scheduled shift times, not the actual hours worked.

139. At all times relevant hereto, ABM INDUSTRIES, INC. directly and/or jointly with ABM JANITORIAL SERVICES, INC., ABM INDUSTRIES NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC. originated, controlled and implemented the payroll policy, practice and procedure of rounding hours worked by hourly janitor employees by having janitors and/or their supervisors put down scheduled shift time on the janitors' timesheets, regardless of the actual time worked.

140. At all times relevant hereto, ABM INDUSTRIES, INC. directly and/or jointly with ABM JANITORIAL SERVICES, INC., ABM INDUSTRIES NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC. originated, controlled and implemented the payroll policy, practice and procedure of rounding hours worked by hourly janitor employees by programming its proprietary payroll software to round electronic punch-in times, regardless of the actual time worked, to reflect the scheduled shift time of the hourly janitorial employee.

141.    At all times relevant hereto, ABM INDUSTRIES, INC. directly and/or jointly with ABM JANITORIAL SERVICES, INC., ABM INDUSTRIES NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC. originated, controlled and implemented the policy, practice and procedure of disciplining, and ultimately terminating, all hourly janitorial employees who arrive after the start of their scheduled shift in all its regions, subsidiaries and affiliates.

142.    At all times relevant hereto, ABM INDUSTRIES, INC. directly and/or jointly with ABM JANITORIAL SERVICES, INC., ABM INDUSTRIES NORTH CENTRAL, INC., ABM JANITORIAL SERVICES – SOUTHEAST, LLC and/or DIVERSCO, INC. established a policy that forbids the payment of overtime for janitors unless it is pre-approved.

143.    As a result of DEFENDANTS' rounding practice as alleged herein, the DEFENDANTS benefited from reduced labor and payroll costs which, in turn, increased the earnings statements of the parent corporation, ABM INDUSTRIES, INC.

**Collective and Class Definitions**

144.    Plaintiff brings Count I as a collective action under the Fair Labor Standards Act, 29 U.S.C. § 216(b), on behalf of janitors who earned overtime but were not paid for it by DEFENDANTS.

145.    The proposed collective class of similarly situated persons is defined as (hereafter referred to as the "Collective Overtime Class"):

> "All janitors (or employees performing similar duties) employed by Defendants, their affiliates, predecessors and successors from July 31, 2012 to the present who: (i) are, or were, employed outside the State of Illinois; (ii) had clock-in and clock-out times recorded on handwritten timesheets only and were not paid by the minute; and (iii) did not receive the full amount of overtime wages earned and owed to them."

146.     Plaintiff brings Counts II and III as a class action pursuant to 735 ILCS 5/2-801 *et seq.* on behalf of herself and all other current and former hourly employees of Defendant who Defendant required or permitted to perform the unpaid pre- and post-shift work described herein.

147.     The proposed overtime class of similarly situated persons pursuant to Count II is defined as (hereafter referred to as the "IMWL Overtime Class"):

> "All janitors (or employees performing similar duties) employed by Defendants, their affiliates, predecessors and successors from June 28, 2012 to the present who: (i) are, or were, employed in the State of Illinois and were not in a union; (ii) had clock-in and clock-out times recorded on handwritten timesheets only and were not paid by the minute; and (iii) did not receive the full amount of overtime wages earned and owed to them."

148.     The proposed Illinois Wage Payment and Collection Act Class of similarly situated persons pursuant to Count III is defined as (hereafter referred to as the "IWPCA Class"):

> "All janitors (or employees performing similar duties) employed by Defendants, their affiliates, predecessors and successors from June 28, 2012 to the present who: (i) are, or were, employed in the State of Illinois and were not in a union; (ii) had clock-in and clock-out times recorded on handwritten timesheets only and were not paid by the minute; and (iii) earned more than the Illinois Minimum Wage but did not receive payment for all straight time wages earned and owed to them."

## COUNT I
## VIOLATION OF THE FAIR LABOR STANDARDS ACT – OVERTIME WAGES

**(Brought as a Class Action by Plaintiff, Veronica Brown, Individually and on Behalf of All Others Similarly Situated)**

149.     Plaintiff re-alleges Paragraphs 1 through 148 as and for Paragraphs 1 through 148 of this Count I.

150.     Plaintiffs bring this case as a collective action on behalf of themselves and other similarly situated janitors pursuant to 29 U.S.C. §216(b) to recover unpaid overtime wages, liquidated damages, attorneys' fees and costs, and other damages owed.

151.    Plaintiffs and the proposed Collective Class members are hourly-paid, non-exempt, full-time janitors whom Defendants employed during the three year statutory period and whose daily clock in and clock out times were rounded to their detriment.

152.    The above class definition excludes those class members in the settlements of *Las v. ABM*, 11 cv 5644 (U.S.D.C., N.D. Ill), *Khadera v. ABM*, 08 cv 417 (U.S.D.C., West. Dist. WA) and *Simpson v. ABM*, 10-2-33915-9 (SEA King County Superior Court, Washington) whose dates of employment do not go beyond the settlement and release periods of those three cases.

153.    Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual members of the class.  These common questions of law and fact include:

> i)    Whether Defendants paid janitors according to their scheduled shift time rather than all time worked;
>
> ii)   Whether Defendants improperly rounded the clock in and out times for janitors who used handwritten timesheets only;
>
> iii)  Whether Defendants failed to keep true and accurate time records for all time worked by the Plaintiffs and the Collective Class;
>
> iv)   Whether Plaintiffs and the Collective Class worked before the start of or after the end of their scheduled shift; and
>
> v)    Whether Defendants paid Plaintiffs and the Collective Class for all work performed in excess of 40 hours per workweek with overtime wages.

154.    Defendants operated under a scheme and practice, as described above, to deprive Plaintiff and the Collective Class of overtime compensation and thereby, increase their earnings statements and, ultimately, the parent corporation's share value.

155.    Section 207(a)(1) of the FLSA states that an employee must be paid overtime, equal to at least one and one half times the employee's regular rate of pay, for all hours worked in excess of 40 hours per week.

156.    Plaintiff and the putative class members were not paid for all hours worked in excess of 40 in a week in violation of the maximum hours provisions of the FLSA, to wit, 29 U.S.C. 207(a).

157.    Plaintiff and members of the Collective Class were subject to the control of Defendants and engaged in activities that were not undertaken for their own convenience, were necessary for the performance of their duties for Defendants and were integral and indispensable to their principal activities.  Despite this, Plaintiff and other members of the collective class regularly were required and/or permitted to work as set forth herein that entitled them to compensation therefore.

158.    Defendants' rounding practices and paying according to scheduled shift time, and not for all time worked, violated the overtime provisions of the FLSA because Defendants did not pay the overtime wages for all work performed by Plaintiff and the Collective Class.

159.    Defendants' rounding practices and timekeeping practices as set forth herein violate the record-keeping requirements set forth in Section 29 U.S.C. § 211(c), and in 29 C.F.R. § 516.2(7)-(9).

160.    At all times relevant hereto, the action of Defendants to not pay premium pay for all hours worked over 40 in a week and its failure to keep accurate payroll records was willful in that Defendants knew that the FLSA required it to pay time and one-half for all hours worked over 40 in a workweek and Defendants knew that the FLSA required them to maintain true and accurate records.  The in-house counsel for ABM INDUSTRIES, INC. knows this from U.S. DOL investigations of its wage and hour policies and practices.

161.    As a direct and proximate result thereof, the Plaintiff and the Collective Class are due unpaid overtime and liquidated damages, pursuant to 29 U.S.C. § 216.

34

162.    Plaintiffs request that the Court authorize notice to the members of the Collective Class to inform them of the pendency of this action and their right to "opt-in" to this lawsuit pursuant to 29 U.S.C. §216(b), for the purpose of seeking unpaid overtime compensation, liquidated damages under the FLSA, and the other relief requested herein.

163.    Plaintiff estimates that there are thousands of putative members of the collective class.  The precise number of collective class members can be ascertained by using Defendants' payroll and personnel records.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

i)      Authorize notice at the earliest possible time informing the Collective Class that this action has been filed, of the nature of the action, and of their right to opt-in to this lawsuit if they worked regular hours or overtime hours in excess of forty hours in a week during the liability period;

ii)     Order the Defendants to furnish to counsel a list of all names and last known addresses of all members of the Collective Class who currently or previously worked for Defendants in the United States within three years of the filing of the original Complaint,

iii)    Declare and find that the Defendants committed one or more of the following acts:

a.      Violated overtime provisions of the FLSA by failing to pay overtime wages to Plaintiff and Collective Class who opt-in to this action;

b.      Willfully violated the overtime provisions of the FLSA; and

c.      Willfully violated the recordkeeping provisions of the FLSA;

iv)     Award compensatory damages, including all pay owed, in an amount according to proof;

v)      Award liquidated damages on all compensation due accruing from the date such  amounts were due;

vi)     Award all costs and reasonable attorneys' fees incurred in prosecuting this claim; and

vii)     For such further relief as the Court deems just and equitable.

## COUNT II
## VIOLATION OF THE ILLINOIS MINIMUM WAGE LAW – OVERTIME WAGES

**(Brought as a Class Action by Plaintiff, Veronica Brown, Individually and
on Behalf of All Others Similarly Situated)**

164.     Plaintiff re-allege Paragraphs 1 through 148 as and for Paragraphs 1 through 148 of this Count I.

165.     Plaintiff brings this count as a class action on behalf of themselves and other similarly situated janitors to recover overtime wages, statutory penalties, attorneys' fees, and costs pursuant to Section 12(a) of the Illinois Minimum Wage Law, 820 ILCS 105/12(a).

166.     Plaintiffs and the proposed overtime class members are hourly-paid, non-exempt, non-union full-time janitors whom Defendants employed at any time since June 28, 2012 and whose daily clock in and clock out times were rounded to their detriment as described *supra*.

167.     Defendants operated under a scheme and practice, as described above, to deprive Plaintiff and the IMWL Overtime Class of overtime compensation and thereby, increase their earnings statements and, ultimately, the parent corporation's share value.

168.     Defendants' practice of requiring or permitting Plaintiff and the members of the Overtime Class to work for Defendants in excess of forty hours per workweek but failing to pay them 1.5 times their hourly rate for such time worked has resulted in Plaintiff and similarly situated employees not being paid the full amount of overtime wages owed to them, in violation of Section 4a of the IMWL, 820 ILCS § 105/4a.

169.     While collecting and preparing their supplies, Plaintiff and members of the IMWL Overtime Class were subject to the control of Defendants and engaged in activities that were not

undertaken for their own convenience, were necessary for the performance of their duties for Defendants and were integral and indispensable to their principal activities.

170.     Defendants' rounding practices and paying according to the scheduled shift time rather than for all work required and/or permitted violated the overtime provisions of the IMWL because DEFENDANTS did not pay the overtime wages for all work performed by Plaintiff and the Overtime Class.

171.     Defendants' rounding practices and paying according to the scheduled shift time rather than for all work required and/or permitted as set forth herein violate the record-keeping requirements under the IMWL and as set forth in Section 29 U.S.C. § 211(c) and in 29 C.F.R. § 516.2(7)-(9).

172.     At all times relevant hereto, the action of Defendants to not pay premium pay for all hours worked over 40 in a week and its failure to keep accurate payroll records was willful in that Defendants knew that the IMWL required it to pay time and one-half for all hours worked over 40 in a workweek and Defendants knew that the IMWL required them to maintain true and accurate records. The in-house counsel for ABM INDUSTRIES, INC. knows this from, *inter alia*, the U.S. Department of Labor investigations of its wage and hour policies and practices, as described in paragraphs 92 to 103 *supra*.

173.     As a direct and proximate result thereof, the Plaintiffs and the IMWL Overtime Class are due unpaid overtime and damages, pursuant to Illinois law and the IMWL.

174.     Common questions of law and fact exist as to all members of the IMWL Overtime Class and predominate over any questions that affect only individual members of the class. These common questions of law and fact include:

   i)     Whether Defendants paid janitors according to their scheduled shift time
          rather than all time worked;

ii)   Whether Defendants improperly rounded the clock in and clock out times for janitors who used handwritten timesheets only;

iii)  Whether Defendants failed to keep true and accurate time records for all time worked by the Plaintiffs and the Collective Class;

iv)  Whether Plaintiffs and the Collective Class worked before the start of or after the end of their scheduled shift; and

v)   Whether Defendants paid Plaintiffs and the Collective Class for all work performed in excess of 40 hours per workweek with overtime wages.

175.   Plaintiff is similarly situated to the employees in paragraph 147 as Plaintiff's claims are typical of the claims of those persons.

176.   Plaintiff believes that the number of employees who fall within the class definitions set forth in paragraph 147 exceeds 100.  Therefore, the number of persons in each putative class is so numerous that joinder of all members is impracticable.

177.   Plaintiff's claims or defenses are typical of the claims or defenses of the persons described in paragraph 147.

178.   This is not a collusive or friendly action.  Plaintiff has retained counsel experienced in complex employment litigation, and Plaintiff and her counsel will fairly and adequately protect the interests of the persons described in paragraph 147.

179.   A class action is the most appropriate method for the fair and efficient resolution of the matters alleged in Count II.

180.   Plaintiffs request that the Court authorize notice to the members of the Overtime Class to inform them of the pendency of this action and their rights under Illinois law.

181.   Plaintiffs estimate that there are hundreds of putative members of the Overtime Class.  The precise number of Overtime Class members can be ascertained by using Defendants' payroll and personnel records.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demand a trial by jury on this and all counts so triable, and pray that this Court award them the following relief under Count I:

   i)    Certify the class defined in paragraph 147 pursuant to 735 ILCS 5/2-801 *et seq*.;

   ii)   Award Plaintiff and similarly situated employees all unpaid overtime wages they earned, plus statutory penalties;

   iii)  Award Plaintiff and the class their attorneys' fees and costs; and

   iv)   Grant such further relief as this Court deems equitable and just.

## COUNT III
## ILLINOIS WAGE PAYMENT AND COLLECTION ACT – STRAIGHT TIME WAGES

**(Brought as a Class Action by Plaintiffs, Veronica Brown, Individually and on Behalf of All Others Similarly Situated)**

182.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 148 as Paragraphs 1 through 148 of this Count III.

183.    Plaintiff, individually and on behalf of all others similarly situated, brings this Count II to recover from Defendant unpaid wages, statutory penalties, attorneys' fees, and costs, pursuant to Section 14(a) of the Illinois Wage Payment and Collection Act, 820 ILCS § 115/14(a).

184.    At all times relevant, and at Defendants' request, Plaintiff and the members of the IWPCA Class performed work for Defendant.

185.    As set forth *supra*, Defendants agreed to pay Plaintiff and the members of the IWPCA Class at an agreed-upon hourly rate at or in excess of the applicable Illinois Minimum Wage hourly rate, for all work Defendants permitted or required.

186.    As set forth *supra*, Defendants assented to the hourly janitors performing their unpaid work before the start of their scheduled shift time by, among other means, Defendants'

knowledge and awareness that janitors collected and prepared their supplies prior to their scheduled shift time, Defendants' policy and practice of requiring and/or permitting the janitors to work before the start of their scheduled shift time when collecting and preparing their supplies, and the lack of any instruction or meaningful effort by Defendants to forbid or not allow the hourly employees to collect and prepare their supplies and otherwise perform work prior to the start of their scheduled shift time.

187.    Defendants regularly observed, without objection or negative comment, Plaintiff and the members of the IWPCA Class perform the work before the start of their shift, through its own supervisors and employees.

188.    At all times relevant hereto, Defendants considered gathering and preparing supplies before the start of a janitor's scheduled shift to be compensable work.

189.    Several thousand janitors work at the Chicago, Illinois branch.  Chicago Branch Manager Adam Klotch, who oversees thousands of janitors, testified under oath in a federal wage and hour class action involving Illinois janitors who gather and prepare their supplies before the start of their scheduled shift time that they should be compensated for that time, stating that "To the best of my understanding, I believe they should be paid for getting the supplies" and that "getting supplies would be part of their work time and they would be paid for that."

190.    When Defendants hired Plaintiff and the members of the IWPCA Class and advised them of the specific hourly rate they would be paid for all work performed by them, Defendants did not inform Plaintiff and the members of the IWPCA Class that they would not be paid for the pre-shift work described herein.

191.    Defendants have failed to pay Plaintiff and the members of the putative IWPCA Sub-Class the full amount due for all time worked on their regularly scheduled paydays, including

but not limited to their final compensation, because Defendants did not pay them for the pre-shift work described herein, in violation of the IWPCA, 820 ILCS § 115/4.

192.     Defendants have failed to pay Plaintiff and the putative class the full amount for all hours worked because of the improper practices described herein.

193.     Illinois Statutes 820 ILCS §§115/1 *et seq*. defines wages as "any compensation owed to an employee by an employer pursuant to an employment contract or agreement between the two parties…".

194.     Under the IWPCA, payment to separated employees is termed "final compensation" and is defined as "wages, salaries, earned commissions, earned bonuses…and any other compensation owed the employee by the employer pursuant to any employment contract or agreement between the two parties."  820 ILCS § 115/2.

195.     Illinois Statutes 820 ILCS §115/4 requires employers to pay employees all wages earned by an employee during a semi-monthly or bi-weekly pay period no later than 13 days after the end of the pay period in which such wages were earned.  Illinois Statutes 820 ILCS §115/5 provides that "every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly schedule payday for such employee."

196.     Defendant violated Illinois Statutes 820 ILCS §§115 *et seq.* by regularly and repeatedly failing to properly compensate Plaintiff and the putative Illinois class members for the actual time they worked each week within 13 days of the date such compensation was earned and by failing to properly compensate Plaintiff and class members their rightful wages by the next scheduled payday after their separation.

197. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the IWPCA have suffered and will continue to suffer lost wages and other damages.

198. Plaintiff and the members of the putative IWPCA Class have been damaged by not being paid the full amount of wages due to them for all time worked, in an amount not presently ascertainable, for the relevant time period.

199. Common questions of law and fact exist as to all members of the IWPCA class and predominate over any questions that affect only individual members of the class. These common questions of law and fact include:

    i) Whether Plaintiffs and similarly situated janitors worked before the start or end of their scheduled shift;

    ii) Whether Defendants failed to keep true and accurate time records for all time worked by the Plaintiff and similarly situated janitors; and

    iii) Whether Defendants paid Plaintiff and similarly situated janitors for all the time Defendants required and/or permitted them to work before the start or end of their scheduled shift.

200. Plaintiff is similarly situated to the employees in paragraph 148 as Plaintiff's claims are typical of the claims of those persons.

201. Plaintiff believes that the number of employees who fall within the class definitions set forth in paragraph 148 exceeds 100. Therefore, the number of persons in each putative class is so numerous that joinder of all members is impracticable.

202. Plaintiff's claims or defenses are typical of the claims or defenses of the persons described in paragraph 148.

203. This is not a collusive or friendly action. Plaintiff has retained counsel experienced in complex employment litigation, and Plaintiff and her counsel will fairly and adequately protect the interests of the persons described in paragraph 148.

204. A class action is the most appropriate method for the fair and efficient resolution of the matters alleged in Count III.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demand a trial by jury on this and all counts so triable, and pray that this Court award them the following relief under Count III:

    i)       Certify the class defined in paragraph 148 pursuant to 735 ILCS 5/2-801 *et seq.*;

    ii)      Award Plaintiff and similarly situated employees all unpaid straight time wages they earned, plus applicable statutory penalties;

    iii)    Award Plaintiff and the class their attorneys' fees and costs; and

    iv)    Grant such further relief as this Court deems equitable and just.

JURY DEMANDED ON ALL COUNTS

Date: July 31, 2015

                **Respectfully Submitted,**
                **VERONICA BROWN,**
                **Individually and on Behalf of**
                **All Others Similarly Situated.**

                By: /s/ Thomas M. Ryan
                      Thomas M. Ryan
                      One of Plaintiff's attorneys

Thomas M. Ryan
Law Offices of Thomas M. Ryan, P.C.
35 E. Wacker Drive, Suite 650
Chicago, IL 60601
312.726.3400

Glen J. Dunn, Jr.
Angel Bakov
Haig A. Himidian
Glen J. Dunn & Associates, Ltd.
221 N. LaSalle St., Suite 1414
Chicago, IL 60601
312.546.5056

James X. Bormes
Catherine P. Sons
Law Office of James X. Bormes, P.C.
8 S. Michigan Ave., Suite 2600
Chicago, IL 60602
312.201.0575